For the reasons set forth in the attached Memorandum, it is hereby

**ORDERED** that the appellee's motion to dismiss the appeal in this case is **GRANTED,** costs to appellee.

Rachel F. **BREM**, M.D.

v.

Drs. **DECARLO, LYON, HEARN & PAZOUREK, P.A.,** et al.

**Civ. A. No. WN–95–222.**

United States District Court, D. Maryland.

May 2, 1995.

Andrew Jay Graham and Geoffrey H. Genth, Kramon & Graham, Baltimore, MD, for plaintiff.

Harriet E. Cooperman, Jody Maier, Weinberg & Green, and William B. Whiteford, Whiteford, Taylor & Preston, Baltimore, MD, for defendants.

## MEMORANDUM OPINION

BLAKE, United States Magistrate Judge.

Rachel Brem, M.D. filed this action against Drs. DeCarlo, Lyon, Hearn & Pazourek, P.A. ("DLHP"), in the Circuit Court for Baltimore County on September 20, 1994. On January 6, 1995, she amended her complaint by adding claims of religious and sex discrimination in violation of Title VII, 42 U.S.C. § 2000a(e). On January 23, 1995, the case was removed to this court pursuant to its federal question jurisdiction.

Judge William Nickerson has referred all discovery disputes in the case to the undersigned magistrate judge pursuant to 28 U.S.C. § 636 and Local Rule 301. Now pending is the defendants' motion to compel the deposition testimony of Paul S. Wheeler, M.D. The issue before the court is whether a physician's opinion regarding the competence of a former resident is discoverable under Md. Health Occ. Code Ann. § 14–501 (1991 and Supp.1994), in a defamation action by that resident against a subsequent employer, when the physician's opinion is based on information he acquired by administering error management conferences involving the review of residents' performances. I find that it is not, and will deny the motion to compel.

### General Background

This case stems from the discharge of Rachel F. Brem, M.D. from the employment of DLHP, a professional association of radiologists. Alleging that she was discharged because of her gender and religion, Dr. Brem has asserted eleven causes of action against the defendants. In connection with her claim for defamation, she alleges that before working at DLHP she "enjoyed a fine reputation as a highly competent radiologist, and her employment prospects were bright due to her record, her reputation and her performance at The Johns Hopkins Hospital." (Compl. ¶ 29). She also alleges that her performance at Johns Hopkins was "exemplary." (Compl. ¶ 34).

In an effort to elicit information regarding Dr. Brem's performance and reputation at Johns Hopkins, the defendants took the deposition of Paul S. Wheeler, M.D. on November 16, 1994. Dr. Wheeler is an associate professor of radiology at Johns Hopkins and is responsible for risk prevention in the department. (Dep. at 10). At the time of Dr. Brem's residency, Dr. Wheeler administered a risk prevention program in which he presented missed diagnoses at error management conferences designed "as a teaching stimulus for people to avoid similar mistakes." (Dep. at 11–12). Although Dr. Wheeler had infrequent contact with Dr. Brem during her residency from 1985 to 1989 (Dep. at 41, 43), he became familiar with her work as a result of his role in peer review/risk prevention activities. (Dep. at 46). His opinion of Dr. Brem's competence as a general radiologist is based on information he learned in that capacity, and he testified that he cannot separate out the opinion he formed as a result of those activities from any he may have had as a result of his own experiences with her or from other sources. (Dep. at 45, 59–60, 108).

Claiming that the information sought by the defendants is privileged under Maryland's peer review committee statute, Md. Health Occ.Code Ann. § 14–501, Dr. Wheeler refused to answer questions at his deposition regarding Dr. Brem's general skill and competence in radiology.[1] The defendants contend that the information they are seeking from Dr. Wheeler is not covered by the privilege and is vital to their defense of the plaintiff's defamation claim. A hearing on their motion to compel was held on April 14, 1995.

### Analysis

Maryland's medical review committee statute provides:

---

1. He commented on Dr. Brem's competence in mammography because his information regarding her skill in that field did not come from his work in peer review/risk prevention activities, but from conversations he had with people who had worked with her. (Dep. at 52, 53).

(d) ... (1) Except as otherwise provided in this section, the proceedings, records, and files of a medical review committee are not discoverable and are not admissible in evidence in any civil action arising out of matters that are being reviewed and evaluated by the medical review committee.

(e) ... Subsection (d)(1) of this section does not apply to:

(1) A civil action brought by a party to the proceedings of the medical review committee who claims to be aggrieved by the decision of the medical review committee; or

(2) Any record or document that is considered by the medical review committee and that otherwise would be subject to discovery and introduction into evidence in a civil trial.

Md. Health Occ.Code Ann. § 14–501 (1991 & 1994 Supp.). By ensuring the confidentiality of peer review proceedings, the Maryland legislature sought to foster effective review of medical care and thereby improve the quality of health care. *Baltimore Sun Co. v. University of Maryland Medical Sys. Corp.*, 321 Md. 659, 666–68, 584 A.2d 683, 686–87 (1991); *Unnamed Physician v. Commission on Medical Discipline*, 285 Md. 1, 13, 400 A.2d 396, 403, *cert. denied*, 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979). As the Court of Appeals has noted, confidentiality is essential because " 'physicians are frequently reluctant to participate in peer review evaluations for fear of exposure to liability, entanglement in malpractice litigation, loss of referrals from other doctors, and a variety of other reasons.' " *Baltimore Sun*, 321 Md. at 666, 584 A.2d at 686 (quoting Comment, *Medical Review Committee Privilege: A Jurisdictional Survey*, 67 N.C.L.Rev. 179, at 179 (1988)). Recognizing that effective review of medical care requires candid as well as objective communication, the legislature enacted the privilege to combat such reluctance. *Id.*

Dr. Wheeler and Johns Hopkins Hospital contend that the information exchanged in connection with the error management conferences administered by Dr. Wheeler is privileged under the statute. DLHP argues that even if the error management conferences constituted medical review activity covered by the statute, the privilege does not apply because this case does not "arise out of" matters reviewed by the committee.

The medical review committee statute protects the proceedings of medical review committees from discovery "in civil actions arising out of matters that [were] reviewed and evaluated by the medical review committee." Md.Health Occ.Code Ann. § 14–501(d). The term "civil action" in the context of the statute was interpreted for the first time in *Unnamed Physician*, where the Court of Appeals determined that it was intended to mean a tort action for medical malpractice. 285 Md. at 12, 400 A.2d at 402. Since then, the statute has been construed in the context of only two other types of cases—wrongful termination and defamation actions by physicians against health care institutions or individual members of a medical review committee. *See, e.g., Sibley v. Lutheran Hosp. of Maryland, Inc.*, 709 F.Supp. 657 (D.Md. 1989), *aff'd*, 871 F.2d 479 (4th Cir.1989) (defamation); *Baltimore Sun*, 321 Md. 659, 584 A.2d 683 (1991) (discussing a wrongful termination claim). In these cases, the exception for civil actions "brought by a party to the proceedings of the medical review committee who claims to be aggrieved by [its] decision" controls, and discovery sought by the physician is permitted. Md. Health Occ.Code Ann. § 14–501(e)(1).

Dr. Brem's lawsuit does not fall into any of the three categories of cases in which the statute has been addressed; it is neither a medical malpractice action nor a wrongful termination or defamation action against the hospital or individuals who participated in the error management conferences. The defendants accordingly contend that the statute is not applicable to this case. They further assert that fairness requires that Dr. Wheeler be compelled to testify as to his opinion and knowledge of Dr. Brem's competence because Dr. Brem raised the issue by asserting her defamation claim.[2] They argue that

---

2. The defendants cite *United States v. Mierzwicki*, 500 F.Supp. 1331, 1335 (D.Md.1980), for the proposition that when confidential communications are made a material issue in a judicial

they cannot defend against that claim without the opinion of Dr. Wheeler because Johns Hopkins was Dr. Brem's only employer prior to DLHP.

In addition, the defendants point to the Court of Appeals' statement that "[t]he words 'arising out of' in [the medical review committee statute] necessarily connote the development of one proceeding out of a different proceeding." *Unnamed Physician,* 285 Md. at 11, 400 A.2d at 401. They argue that Dr. Brem's civil action did not arise out of any matter reviewed in the error management conferences because DLHP fired her based solely on her performance at DLHP and without any knowledge of the discussions in the Johns Hopkins conferences. The "arising out of language" is subject to another interpretation, however. The statute states that it applies to "civil actions arising out of matters that [were] reviewed and evaluated" by the committee. Dr. Brem's civil action for defamation is based on her alleged reputation as a competent radiologist at Johns Hopkins, and her competence there was indeed a matter reviewed and evaluated at Dr. Wheeler's error management conferences. Moreover, despite Maryland's general rule of interpreting privileges narrowly, *see United States v. Mandel,* 415 F.Supp. 1025 (D.Md.1976), *aff'd in part and vacated in part,* 591 F.2d 1347 (4th Cir.1979), the Court of Appeals has stated that the medical review committee statute was intended to provide "broad statutory protection." *Baltimore Sun,* 321 Md. at 668, 584 A.2d at 687. The statute is based on "legislative appreciation that a high level of confidentiality is necessary for effective medical peer review," and reflects a determination "that a system of effective medical peer review outweighs the need for complete public disclosure." *Id.*

In fact, the statutory exception for actions initiated by physicians aggrieved by a com-

mittee decision appears to be the only civil action in which information gleaned from such a committee was intended to be discoverable. *See id.* at 670, 584 A.2d at 688 ("The rule of confidentiality ... is so all encompassing that it was necessary expressly to carve out an exception ... in order to allow a physician who is the subject of a peer review to obtain the records for use in that physician's challenge to peer review conclusions.") (Rodowsky, J., concurring). The exception reflects the legislature's understanding that in "limited circumstances" disclosure may be justified to protect "the due process rights of a physician aggrieved by the decision of the medical review committee." *Id.* at 668, 584 A.2d at 687. No such rights are implicated in this case.

Although it appears that no Maryland court has addressed the applicability of the statute in the context presented here, other courts interpreting the "arising out of" language in similar medical review committee statutes have adopted a broad view. Florida courts, for example, have held that Florida's medical review committee statutes apply where the hospital housing the medical review committee from which discovery is sought is not a party to the underlying litigation. *See Cruger v. Love,* 599 So.2d 111 (Fla.1992) (applying Fla.Stat. ch. 766.101(5) & 395.011(9) (1989)); *Miami Heart Inst. v. Reis,* 638 So.2d 530 (Fla.Dist.Ct.App.1994) (applying Fla.Stat. ch. 766.101(5) & 395.0191(8) (1993)). In ruling that the statute applied in *Cruger,* the Supreme Court stated:

A different interpretation of this provision would completely eviscerate the protection the legislature sought to provide. Ultimately, all peer review committee records would be discoverable. What would not be discoverable in one action because of the

---

proceeding, fairness demands that the party raising the issue be treated as having waived the privilege. The cases that have upheld that proposition, however, have involved clients that attempted to claim the attorney/client privilege after waiving it by making assertions about privileged communications. *See United States v. Aronoff,* 466 F.Supp. 855, 862 (S.D.N.Y.1979). Dr. Brem's case is clearly distinguishable. Not only is there no indication that the medical review

committee privilege is hers to waive, but she has made no assertion regarding privileged communications. She has alleged that she had a fine reputation as a competent radiologist at Johns Hopkins; she has not asserted that a missed diagnosis by her was never reviewed in an error management conference. For further discussion of the defendants' waiver allegations, see *infra* pp. 100–01.

nature of the lawsuit would be discoverable in another action. The confidential nature of the peer review proceedings would be obliterated.

599 So.2d at 115. In *Miami Heart,* which stemmed from a physician's defamation action against a party other than the hospital from which discovery was sought, the court rejected an argument identical to the defendants' in *Brem:*

> Defendants argue ... we should fashion an exception to the privilege to allow access to the peer review records where, as here, the party who seeks discovery is a defendant who has not chosen to institute litigation but has instead been forced into a defensive position and asserts a need for the records to prove its defense.

638 So.2d at 531. Citing *Cruger,* the court ruled that "[t]he constancy of the privilege ... does not vary with the nature of the litigation or the procedural posture of the case, and does not depend upon whether the medical review committee is a party or merely a potential source of information." *Id.* at 532. Similarly, the Supreme Court of Georgia ruled in *Emory Clinic v. Houston,* 258 Ga. 434, 369 S.E.2d 913 (1988), that Ga.Code Ann. § 31–7–143, another medical review committee statute similar to Maryland's, places "an absolute embargo upon discovery and use of all proceedings, records, findings and recommendations of peer review groups and medical review committees in civil litigation." *Id.* 369 S.E.2d at 913.

Thus, other courts' interpretations of similar medical review committee statutes, as well as the plain language of the Maryland statute and the public policy underlying it indicate that the privilege provided in section 14–501 should apply in this case, and that any opinion formed by Dr. Wheeler as a result of his participation in the error management conferences should be protected.

■ In support of their motion to compel, the defendants also assert that Dr. Wheeler's error management conferences did not con-

stitute a medical review committee under the statute. Although, as the defendants point out, the conferences were not called medical review committee meetings, Dr. Wheeler explained at his deposition that they were a part of the quality assurance program at Johns Hopkins. (Dep. at 117). Under section 14–501(c), a medical review committee:

> (1) Evaluates and seeks to improve the quality of health care provided by providers of health care; [or]
>
> (2) Evaluates the need for and the level of performance of health care provided by providers of health care....

Md. Health Occ. Code Ann. § 14–501(c)(1) and (2). The error management conferences, which consisted of reviewing diagnostic mistakes in an effort to teach radiologists not to make similar mistakes, were evaluation-based activities aimed at improving the quality of health care. The defendants' contention that the conferences are not covered by the statute because their primary purpose was educational is entirely without merit. The conferences meet the functional requirements of the statute.

In order to qualify as a medical review committee entitled to the privilege, however, the conferences also must fall under one of the categories enumerated in section 14–501(b). Section 14–501(b)(5) provides for

> [a] committee of the medical staff or other committee, including any risk management, credentialling, or utilization review committee established in accordance with § 19–319 of the Health–General Article, of a hospital ... if the governing board of the hospital ... forms and approves the committee or approves the written bylaws under which the committee operates.

*Id.* § 14–501(b)(5).[3] Faculty members as well as staff contributed to the error management conferences at Johns Hopkins; staff members reported missed diagnoses to Dr. Wheeler and spoke with the radiologist who had made the alleged mistake, and Dr. Wheeler reviewed the missed diagnoses with

---

**3.** It is unclear whether the error management conferences met the specific requirements outlined in § 19–319 of the Health–General Article. Rather than focusing on this issue in their papers or at the hearing, the parties concentrated on whether the conferences met the functional requirements of the statute. Because I find they clearly did, I will treat the conferences as falling under the statute without expressly finding that the requirements of § 19–319 were satisfied.

the staff at the conferences. (Dep. at 11–12). Moreover, the conferences were developed as a result of the hospital's decision to make Dr. Wheeler responsible for risk prevention in the department. (Dep. at 10). Dr. Wheeler was requested to define the risks in the department, and initiated the error management conferences because he believed "the risks that were of greatest intellectual importance were the recognized judgmental errors of resident and staff members." (Dep. at 11). The program was approved by the department chairperson. (Dep. at 11).

■ The defendants nevertheless argue that the conferences are not covered by the statute because Dr. Wheeler alone decided which missed diagnoses would be presented, and the mistakes were identified through the day-to-day review of x-rays rather than by a formal committee established for that purpose. Moreover, the defendants claim that the fact that Dr. Wheeler was not responsible for meeting with the individuals for whom a mistake had been identified indicates that the focus of the program was not peer review. The statute, however, does not require that a formal committee identify the mistakes of health care providers. Nor does it require that the person who presents the mistakes be the person who speaks with the individuals who made them.[4] The statute's primary purpose is to ensure that the proceedings of medical review committees dedicated to the improvement of health care through the evaluation of past care remain confidential, so that health care professionals will feel free to criticize a colleague's work without the fear of entanglement in litigation as a result. *See Kappas v. Chestnut Lodge, Inc.,* 709 F.2d 878, 880 (4th Cir.), *cert. denied,* 464 U.S. 852, 104 S.Ct. 164, 78 L.Ed.2d 150 (1983) (applying the privilege to staff conferences established as a means of evaluating the patient care and treatment programs at a hospital).[5] Thus, I reject the defendants' argument that the error management conferences conducted by Dr. Wheeler

do not fall within the purview of the medical review committee statute.

■ The defendants also claim that Dr. Wheeler's knowledge and opinions are not protected because the medical review committee statute covers only "proceedings, records, and files." *See* Md. Health Occ. Code Ann. § 14–501(d). In support of their argument, they point out that other states' statutes include language prohibiting a person who attended a meeting of a medical review committee from testifying regarding matters presented at that meeting. *See* Ga.Code Ann. § 31–7–133 (1985). They argue that had the Maryland legislature intended that persons present at such meetings be precluded from commenting on the matters discussed, it presumably would have stated as much in the statute. This argument, however, is contrary to the statute's purpose of effectuating meaningful review and improving medical care by ensuring the confidentiality of medical review committee meetings. *See Baltimore Sun,* 321 Md. at 666–68, 584 A.2d at 686–87. Under the defendant's narrow interpretation of the statute, parties, including plaintiffs in medical malpractice suits, simply could rely on deposition testimony instead of documents in pursuing their claims, clearly defeating the purpose of the statute.

■ That does not mean that all opinions held by Johns Hopkins physicians are protected from discovery. An opinion derived from information or knowledge obtained independent of the error management conferences would not be covered by the statute. *See Cruger,* 599 So.2d at 115 ("[Committee participants] can be compelled to state what they actually know to be true, but they cannot say whether they disclosed this same information to a board or committee.") (Kogan, J., concurring). For example, a physician who personally witnessed Dr. Brem's work at Johns Hopkins and formed an opinion regarding her competence as a result

---

4. The physicians who brought the missed diagnoses to Dr. Wheeler's attention were responsible for speaking confidentially with the person responsible. (Dep. at 12). Further, physicians who attended the conferences presumably might recognize cases they had worked on.

5. This case applied Md.Health–Gen.Code Ann. § 134A, Maryland's former medical review committee statute, which, unlike § 14–501, did not refer to a credentialling statute such as Md. Health–Gen.Code Ann. § 19–319.

thereof would be permitted to testify as to that opinion regardless of whether the information on which it is based also was reviewed in an error management conference. Dr. Wheeler, however, has testified that he has no such independent knowledge; his opinion of Dr. Brem's competence as a general radiologist is based on what other physicians relayed to him in his capacity as administrator of the error management conferences. (Dep. at 45–46, 59–60, 108). Thus, his opinions are covered by the statute.

■ Finally, the defendants argue that any privilege that might attach to the knowledge and opinions of Dr. Wheeler has been waived. Maryland's medical review committee statute does not provide for waiver, and it appears that there are no reported Maryland cases addressing the issue. The Georgia Supreme Court, however, has held that the waiver analysis ordinarily applied to individuals' privileged communications is inapplicable in the context of the medical review committee privilege. *Emory Clinic*, 369 S.E.2d at 913 (citing *Eubanks v. Ferrier*, 245 Ga. 763, 267 S.E.2d 230 (1980) (holding that plaintiff's knowledge of information from a peer review committee member did not alter the prohibition)). The court explained that "[A] person who has nothing to waive can waive nothing." *Id.* 369 S.E.2d at 914. Like Georgia's statute, Maryland's section 14–501 was enacted to improve the quality of health care by safeguarding the candor necessary to ensure effective medical review. Permitting waiver of the statute either by a single committee member or by the health care provider would contravene the policy underlying the statute. Thus, I find no merit in the defendants' argument that the privilege has been waived.

■ State privileges, it must be noted, do not necessarily apply in federal court when the jurisdiction of the court is based on a federal question. *LeMasters v. Christ Hosp.*, 791 F.Supp. 188, 189 (S.D.Ohio 1991); *Lewis v. Capital Mortgage, Invs.*, 78 F.R.D. 295, 313 (D.Md.1977). While federal courts may choose to apply state privilege law by analogy or as a matter of comity, *LeMasters*, 791 F.Supp. at 189, Federal Rule of Evidence 501 leaves the application of privileges to the trial court's discretion. *Etienne v. Mitre*

*Corp.*, 146 F.R.D. 145, 146 (E.D.Va.1993); *see also LeMasters*, 791 F.Supp. at 189. A federal court first recognized a self-critical analysis privilege under federal common law in the context of a request for discovery of medical review committee materials in *Bredice v. Doctors Hosp., Inc.*, 50 F.R.D. 249 (D.D.C.1970), *aff'd*, 479 F.2d 920 (D.C.Cir. 1973). Since then, courts have reached different conclusions regarding whether a medical peer review privilege based on either a state statute or the self-critical analysis privilege should be embraced in federal question cases. *LeMasters*, 791 F.Supp. at 190. It appears, however, that the cases in which courts have elected not to apply either the statutory protection or the privilege generally have involved discovery requests by plaintiff physicians in federal discrimination or anti-trust suits against the hospital that established the peer review committee. *See Memorial Hosp. v. Shadur*, 664 F.2d 1058 (7th Cir.1981); *LeMasters*, 791 F.Supp. 188; *Wei v. Bodner*, 127 F.R.D. 91 (D.N.J.1989); *Doe v. St. Joseph's Hosp.*, 113 F.R.D. 677 (N.D.Ind.1987); *Dorsten v. Lapeer County Gen. Hosp.*, 88 F.R.D. 583 (E.D.Mich.1980). In this case, the defendant seeks the information to defend against a defamation claim. The hospital is not a party.

Courts that have upheld the self-critical analysis privilege have generally recognized three criteria that must be met in order for it to apply: 1) the information sought must result from an internal review conducted to improve procedures or products; 2) the party conducting the review must have intended that the information remain confidential in order to preserve the free exchange of ideas; and 3) the information must be such that permitting discovery of it would curtail that free exchange. *Etienne*, 146 F.R.D. at 147 (citations omitted). Under the third criterion, courts must balance the public interest carried out by protecting the confidentiality of the internal review proceedings against the need of the party seeking discovery to prove its case. *Id.* "Essentially, the court must determine whether the type of internal review conducted by the party invoking the privilege is one that benefits the public interest and would be curtailed in the future if it

were subject to disclosure during civil discovery." *Id.* at 147–48.

In *Witten v. A.H. Smith & Co.*, 100 F.R.D. 446 (D.Md.1984), *aff'd*, 785 F.2d 306 (4th Cir.1986), a case dealing with the self-critical analysis privilege, the district court ruled that the privilege did not protect affirmative action reports from discovery in a race discrimination suit. In that case, however, the court found that disclosure would not reduce the level of compliance with federal equal employment opportunity laws. *Id.* at 452. It explained that

> [r]egardless of whether this privilege is recognized, and unlike the potential loss of the peer review meetings and reports present in *Bredice,* these reports in question in this case will continue to be demanded of all entities wishing to contract for the federal government.

*Id.* at 453. Thus, the public interest served by compiling the reports would not be put at risk by permitting disclosure.[6]

In *Etienne,* which like *Witten* refused to apply the self-critical analysis privilege in an employment case, the court distinguished "hospital and academic peer review settings, where the confidential nature of the internal review is essential to allow hospitals and schools to improve their procedures...." 146 F.R.D. at 148.

In this case, the purpose of the Maryland medical review committee statute of improving the quality of health care would be thwarted if confidentiality of the proceedings were not protected. Moreover, the public interest in promoting quality health care outweighs the defendants' purported need for the information, as DLHP is free to obtain opinions regarding Dr. Brem from persons whose opinions are based on information other than that which they learned as a result of the error management conferences. Because the information disclosed to Dr. Wheeler through his administration of the error management conferences, as well as any opinion he formed based on that information, satisfies each of the criteria enumerated in *Etienne* for application of the self-critical analysis privilege, and because the Maryland statute evidences a strong public policy commitment to protect the confidentiality of such information, discovery of Dr. Wheeler's opinion of Dr. Brem's competence in general radiology will be denied by separate order.

---

6. The court also noted, by comparison, that in a peer review situation, "independent practitioners are critiquing the actions of a fellow professional," thereby making the "potential for frank criticism ... more likely." *Witten,* 100 F.R.D. at 453.