Fletcher J. JOHNSON, M.D., et ano., Plaintiffs,

v.

NYACK HOSPITAL, et al., Defendants.

94 Civ. 7464 (LAK).

United States District Court, S.D. New York.

Dec. 17, 1996.

552

George R. Clark, Annemarie Scanlon Harthun, Reed Smith Shaw & McClay, for Plaintiffs.

Ronald S. Rauchberg, Nancy Kilson, Proskauer Rose Goetz & Mendelsohn L.L.P., New York City, for Defendants.

David Zarett, Jordy Rabinowitz, Garfunkel Wild & Travis, Great Neck, NY, for Good Samaritan Hospital, Horton Medical Center, and Columbia Presbyterian Medical Center.

Douglas V. Sanchez, Hein, Smith, Berezin, Maloof, Davidson & Jacobs, Hackensack, NJ, for Pascack Valley Hospital.

Thomas A. Mobilia, Gregory J. Radomisli, Martin, Clearwater & Bell, New York City, for Jamaica Hospital.

Michael L. Prigoff, Lebson, Prigoff & Baker, Englewood, NJ, for Engelwood Hospital and Medical Center, and Jamaica Hospital.

## OPINION

KAPLAN, District Judge.

Plaintiff Fletcher J. Johnson's privileges to perform vascular and thoracic surgery at defendant Nyack Hospital were revoked in 1987. His 1994 reinstatement application was denied, purportedly on the ground that he failed to establish his current clinical competence. This is the third lawsuit he has brought concerning these events.[1] What remains of this case is Dr. Johnson's claim that Nyack's 1994 action was the product of racial discrimination and violated 42 U.S.C. §§ 1981, 1985(3). The matter now is before the Court on defendant's motion *in limine* and the motions of six other hospitals to quash *subpoenae duces tecum* served by Dr. Johnson and/or the defendants[2] which seek to force them to produce, *inter alia*, peer review records concerning assessments of the performance at those other institutions of either Dr. Johnson or a number of other doctors on the Nyack Hospital medical staff.

### The Context of the Discovery Dispute

Dr. Johnson claims that Nyack's action was motivated by race and that Nyack's claim that he failed to establish his clinical competence is a pretext. In support of these contentions, the amended complaint alleges that Dr. Johnson was granted vascular/thoracic surgery privileges at Pascack Valley and Jamaica Hospitals at about the same time that his reinstatement application was denied by Nyack and that he has an unblemished record at other hospitals at which he enjoys privileges. (Am Cpt ¶¶ 37, 43) In

1. The Court assumes familiarity with the prior opinions in this and the prior case brought in this district. *Johnson v. Nyack Hospital*, 86 F.3d 8 (2d Cir.1996), *aff'g* 891 F.Supp. 155 (S.D.N.Y. 1995) (Kaplan, J.); *Johnson v. Nyack Hospital*, 964 F.2d 116 (2d Cir.1992), *aff'g* 773 F.Supp. 625 (S.D.N.Y.1991) (Sweet, J.)

2. The defendants are Nyack Hospital, Kenneth Steinglass, M.D., Daniel Berson, M.D., Lawrence Simon, M.D., James Dawson, Donald Winikoff, M.D., Gregor Anderson, and Rockland Thoracic Associates, P.C.

order to meet these allegations, defendants have subpoenaed extensive records from Pascack Valley and Jamaica concerning Dr. Johnson's surgical privileges and credentialing as well as records concerning Dr. Johnson's performance from Engelwood Hospital and Medical Center and Good Samaritan Hospital as well as from Pascack Valley and Jamaica.

Dr. Johnson has cast an equally wide discovery net. He contends in substance that the standard applied to him by Nyack Hospital was elevated on account of his race and that Nyack, in extending or continuing privileges of white doctors, overlooked events at least as troublesome as those upon which it relied in taking action concerning Dr. Johnson. He therefore has served *subpoenae duces tecum* on four hospitals—Columbia Presbyterian Medical Center, Horton Medical Center, Westchester County Medical Center and Good Samaritan Hospital—seeking a wide range of documents concerning five other vascular/thoracic surgeons with privileges at Nyack, Drs. Steinglass, Ginsburg, Gorenstein, Schwartz and Trent, all of whom are members of Rockland Thoracic Associates, P.C. ("Rockland").

Six of the hospitals have moved to quash the *subpoenae* served upon them. Broadly speaking, they claim that the records sought are privileged under New York or New Jersey laws that protect hospital peer review and quality assurance documents from discovery. The parties dispute the claims of privilege, but Nyack Hospital seeks by its motion *in limine* to moot or narrow much of the discovery controversy. It seeks to exclude:

"Any and all evidence (1) that in 1995 Dr. Johnson obtained privileges to perform thoracic and vascular surgery at Pascack Valley and Jamaica Hospitals; (2) that his record of vascular and thoracic surgery at hospitals other than Nyack Hospital ... demonstrates his competence, except to the extent that any such information was submitted to or considered by Nyack in connection with Dr. Johnson's 1994 application for privileges; and (3) relating to the practice of thoracic and vascular surgeons other than Dr. Johnson at hospitals other than Nyack." (Def.Mem. 1)

*Discussion*

*The Motion* In Limine

The standard of relevance that governs the admissibility of proof at trial is FED.R.EVID. 401, which provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The threshold question presented by the motion *in limine* is whether each of the categories of proof that Nyack now wishes to exclude meets this standard.

*Privileges at Pascack Valley and Jamaica Hospitals*

■ Dr. Johnson contends that Nyack Hospital denied his application for reinstatement in 1994 on the basis of race and that Nyack's contention that Dr. Johnson had not established his competence is refuted by the fact that Pascack Valley and Jamaica Hospitals granted him comparable privileges more or less contemporaneously. Defendants argue that the actions of those hospitals are not probative, essentially on the theory that Nyack was entitled to set its own standards and, in any case, that Nyack's action must be assessed against the information available to Nyack when it acted, which allegedly was different than that upon which the other hospitals based their determinations.

Defendants' points are valid as far as they go, but they do not go far enough. While Nyack is entitled to set its own standards,[3] the record developed to date does not permit the Court to conclude whether its standards were higher, lower or the same as the other hospitals. Similarly, there is no basis for concluding as a matter of law that the information before Pascack Valley or Jamaica was the same as or different from that upon which Nyack acted. To the extent, if any,

---

**3.** *See generally* 1 LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 10.02[3], at 10–19 to 10–20 (2d ed. 1995).

that the evidence ultimately would permit a trier of fact to conclude that the information before Nyack and the standards it applied in Dr. Johnson's case made Nyack's circumstances comparable to those in which either or both of the other hospitals acted, it perhaps could lead a trier of fact to infer that Nyack acted for a different reason.[4] The Court therefore cannot responsibly conclude that evidence of the privilege decisions at Pascack Valley and Jamaica Hospitals could have no tendency to establish that Nyack Hospital's decision rested on a ground other than that which it claims.

A conclusion that Rule 401 has been or may be satisfied of course does not necessarily result in the receipt of the proffered evidence. Rule 403 permits the trial court to exclude even relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." And this is a case in which a Rule 403 objection to evidence concerning the Pascack Valley and Jamaica decisions might prove to be substantial. To mention only one of the considerations articulated by the rule, the greater the difference between the circumstances of their decisions and those of Nyack Hospital's, the less the probative value of their actions. But the record now before the Court does not permit the careful weighing of probative value against adverse consequences that Rule 403 requires. Accordingly, Nyack's motion to exclude all evidence concerning the Pascack Valley and Jamaica Hospital privileges decisions is denied without prejudice to renewal following the close of discovery.

*Dr. Johnson's Performance at Other Hospitals*

■ Defendants' principal argument with regard to this evidence is that "the issue is not whether in the course of Dr. Johnson's long career as a surgeon he has ever performed competently, but whether, on the record before Nyack in 1994, its decision not to

grant the privileges he requested is so lacking in basis as to be pretextual." (Def.Mem. 6–7) In other words, it contends that only Dr. Johnson's performance at or known to Nyack properly has a bearing on the issues in this case. Dr. Johnson, however, wishes to make a broader point. He proposes to testify that he had practiced elsewhere for years without difficulty. The implication, of course, is that Nyack's problem with him was racial rather than professional.

Evidence of Dr. Johnson's performance at other hospitals might have a tendency to suggest to the trier of fact that he either was or was not competent at the time Nyack Hospital acted. This in turn could have some bearing on whether Nyack in fact acted for the reasons it claims rather than out of racial animus as plaintiff alleges.

To be sure, defendants are correct to the extent they suggest that such evidence would be significantly more persuasive if it was known to Nyack and of much more limited value if it was not. In substance, their position is that the probative value of evidence of Dr. Johnson's performance elsewhere, unknown to Nyack, would be quite small at best, that it would be outweighed substantially by the adverse consequences enumerated in Rule 403, and that the Court therefore should preclude such evidence and thereby substantially limit the scope of the discovery controversy.

The Court is unwilling to accept this invitation at this juncture. To begin with, excluding evidence of Dr. Johnson's performance except to the extent it was known by Nyack would not resolve the discovery dispute. As is discussed in greater detail below, plaintiff might be entitled to the discovery anyway on the theory that information concerning Dr. Johnson's record at other hospitals would be necessary to test Nyack's denial of knowledge of that information. Moreover, it is difficult to predict with confidence the posture of the case at the time it is ready for trial. It may well be that discovery will yield information that would increase the apparent probative value of such evidence beyond what

---

4. That might not be the only permissible inference. A trier, depending upon the record, conceivably might infer that Nyack or the other hospitals simply made bad or erroneous judgments.

now appears. Indeed, one cannot confidently rule out the possibility that defendants themselves will open the door. Accordingly, this branch of the motion *in limine* is denied without prejudice to renewal after the close of discovery as well.

### Records of Other Nyack Surgeons at Other Hospitals

■ Plaintiff hopes to develop evidence that Nyack overlooked bad outcomes and other adverse events in the performance at other hospitals of five white vascular/thoracic surgeons with privileges at Nyack while seizing on comparable occurrences to refuse reinstatement to Dr. Johnson. Defendants contend that evidence of the performance of the white physicians at other institutions is irrelevant because Nyack, in making reappointment decisions, considers only suspensions, annulments or limitations of privileges at other institutions, the existence of such information would be reflected in Nyack's files, and there accordingly is no need to obtain records of other institutions.

Defendants' argument confuses considerations bearing on the relevance of evidence for purposes of admissibility at trial with the propriety of the discovery sought from the other institutions. Focusing on the admissibility question, Dr. Johnson is entitled to prove, if prove he can, that Nyack treated white surgeons differently than it treated him in denying his reappointment application. Hence, to the extent defendants seek to exclude evidence relating to the practice of the other surgeons at other hospitals which was known to Nyack when it made privilege decisions regarding those surgeons, their application has no merit. On the other hand, Nyack's objection to evidence concerning the practices of those surgeons at other hospitals absent proof that the evidence was known to Nyack is well taken.

### Summary as to Motion In Limine

For the reasons outlined above, defendants' motion *in limine* is denied without prejudice to renewal after the close of discovery except that the Court will not receive evidence of or entertain arguments concerning the activities of Drs. Steinglass, Gins-

burg, Gorenstein, Schwartz and Trent at other hospitals except to the extent the information was known to Nyack Hospital and otherwise is admissible.

### The Motions to Quash

Defendants' *subpoenae*, broadly speaking, seek all documents relating to the (1) appointment, reappointment and privileges of Dr. Johnson; (2) quality assurance, morbidity and mortality reviews; and (3) any incidents or allegations of malpractice or any expressions of concern about his competence, as well as documents sufficient to identify all vascular and thoracic surgical procedures performed by Dr. Johnson at the hospital subpoenaed. Dr. Johnson's *subpoenae* seek, *inter alia*, all documents relating to (1) incidents or allegations of malpractice involving Drs. Steinglass, Ginsburg, Gorenstein, Schwartz and Trent;[5] (2) allegations of racial discrimination concerning them; (3) quality assurance, morbidity and mortality reviews relating to them; (4) revocation, curtailment or limitation of their privileges; (5) peer reviews of them; and (6) the competence of these other Nyack doctors. In addition, they demand all documents prepared by these doctors that relate to Dr. Johnson as well as documents sufficient to identify all vascular or thoracic surgery procedures performed by them.

### Relevancy

The determination that most of the evidence that defendants seek to exclude is relevant within the meaning of FED.R.EVID. 401 establishes the relevancy of the discovery sought in those areas. But the determination that evidence of the performance of the other Nyack doctors at other institutions is not admissible except to the extent known to Nyack does not alone foreclose discovery on that subject.

■ The scope of discovery in federal courts is expansive. FED.R.CIV.P. 26(b)(1) states that:

"[p]arties may obtain discovery regarding any matter ... which is relevant to the subject matter involved in the pending action.... The information sought need not

---

5. As well as any other members of Rockland Thoracic Associates.

be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

"Relevance" for purposes of discovery, moreover, is "synonymous with 'germane' and ... it should not be read as meaning 'competent' or 'admissible.'" 8 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2008, at 111 (1994). Evidence sought in discovery need only be relevant to the subject matter of the action, and not to the particular issues presented. *Id.* at 99. Hence, if the information sought is relevant to the subject matter of the action, it is within the outermost limits of permissible discovery.

■ Dr. Johnson argues that the records of the white vascular/thoracic surgeons at other hospitals fall within this capacious standard. Even conceding that their performance elsewhere could be probative of Dr. Johnson's disparate treatment claim only to the extent that the performance was known to Nyack, he argues that the Court should not assume that Nyack would have documented, or readily will admit, its awareness that favored white members of its staff allegedly had performed badly at other institutions. Only by obtaining records from those other institutions identifying specific information about which Nyack and its personnel may be questioned, he argues, can Nyack's awareness be established, if indeed it can be established at all.

There is something to Dr. Johnson's argument. Human experience teaches that not everything learned at the water cooler, so to speak, finds its way into institutional files or is readily acknowledged upon questioning. Nyack's knowledge of the performance of the five white surgeons therefore may not be reflected in its files or what its witnesses are prepared to say in deposition or at trial. Moreover, given that defendant Dr. Steinglass is the head both of the committee that denied Dr. Johnson the disputed privileges and of Rockland Thoracic Associates, it seems reasonable that he may have information about any bad outcomes that the other Rockland doctors experienced at other hospitals. With the requested information, the plaintiffs might be able to obtain admissions from Dr. Steinglass that otherwise might not readily be forthcoming. This Court finds that certain of this evidence sought by Dr. Johnson is reasonably calculated to lead to the discovery of admissible evidence. The parties therefore may discover evidence of malpractice claims, suspensions, and adverse administrative actions or findings involving the doctors in question.

*The Claimed Privileges*

All of the hospitals seek to have the *subpoenae* quashed on the grounds that the documents they seek are privileged. The New York hospitals—Columbia Presbyterian, Good Samaritan, Horton, and Jamaica—rely on N.Y.EDUC.L. § 6527, subd. 3 (McKinney 1985), and N.Y.PUB.HEALTH L. § 2805–m (McKinney 1993).[6] The New Jersey hospitals—Pascack Valley and Engelwood—rely on the New Jersey case law privilege protecting the confidentiality of self-critical anal-

6. N.Y.EDUC.L. § 6527, subd. 3, provides that:

"Neither the proceedings nor the records relating to performance of a medical review function described herein shall be subject to disclosure under article thirty-one of the civil practice law and rules except as hereinafter provided or as provided by any other provision of law. No person in attendance at a meeting when a medical review function described herein was performed shall be required to testify what transpired thereat. The prohibition relating to discovery of testimony shall not apply to the statements made by any person in attendance at such a meeting who is a party to an action or proceeding the subject matter of which was reviewed at such meeting."
N.Y.PUB.HEALTH L. § 2805–m provides that:

"Notwithstanding any other provisions of law, none of the records, documentation, or committee actions or records required pursuant to [the sections of the statute mandating peer-review programs] shall be subject to disclosure under article six of the public officers law or article thirty-one of he civil practice law and rules, except as hereinafter provided or as provided by any other provision of law. No person in attendance at a meeting of any such committee shall be required to testify as to what transpired thereat. The prohibition relating to discovery of testimony shall not apply to the statements made by any person in attendance at such a meeting who is a party to an action or proceeding the subject matter of which was reviewed at such meeting."

ysis[7] and N.J.STAT. § 2A:84A–22.8 (1994).[8] The Court assumes *arguendo* that some (but by no means all) of the documents would be protected under the state law relied upon. The threshold question, however, is the relevance of state law to this determination.

### 1. *The Issue Is Governed By Federal Law*

■ This action is brought entirely under Reconstruction era federal civil rights laws. FED.R.EVID. 501 provides in relevant part:

"Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness [or] person ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

It is well established that federal rather than state privilege law governs in federal question cases such as this. *von Bulow v. von Bulow,* 811 F.2d 136, 141 (2d Cir.1987). Hence, federal law governs the privilege issue presented here.

The hospitals nevertheless argue that this Court should apply the privileges created by the law of New York and New Jersey because " 'a strong policy of comity ... impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy.' " (Def.Mem. at 3) (quoting *Lora v. Board of Education,* 74 F.R.D. 565, 576 (E.D.N.Y.1977)); *see also United States*

*v. King,* 73 F.R.D. 103, 105 (E.D.N.Y.1976) (using same language); *Apicella v. McNeil Laboratories, Inc.,* 66 F.R.D. 78 (E.D.N.Y. 1975) (same).

The hospitals' argument has a worthy provenance. Many federal courts have applied state privilege law after satisfying themselves that the state principle at issue did not conflict with, or outweighed, federal policy. *See Brem v. DeCarlo,* 162 F.R.D. 94 (D.Md.1995) (applying Maryland medical peer review privilege in federal question action); *Komlosi v. New York State Office of Mental Retardation & Development Disabilities,* 1992 WL 77544 (S.D.N.Y.1992) (applying New York privilege law); *Doe v. St. Joseph's Hospital,* 1987 WL 15462 (N.D.Ind. 1987) (applying Indiana privilege law); *Mewborn v. Heckler,* 101 F.R.D. 691 (D.D.C.1984) (applying District of Columbia privilege law); *Gillman v. United States,* 53 F.R.D. 316 (S.D.N.Y.1971) (applying New York privilege law).

Indeed, the Second Circuit, in a brief *per curiam* opinion, stated that "as a matter of comity federal courts accord deference to state created privileges." *United States v. One Parcel of Property at 31–33 York St.,* 930 F.2d 139, 141 (2d Cir.1991). Nevertheless, this Court views the matter differently and does not regard *31–33 York* as controlling this case.

To begin with, as noted above, Rule 501 mandates the application of federal privilege law in federal question cases. The federal courts are directed by the Rule, which is a

---

**7.** *See, e.g., McClain v. College Hosp.,* 99 N.J. 346, 492 A.2d 991 (1985) (requiring showing of particularized need as prerequisite to disclosure of records regarding professional conduct); *Bundy v. Sinopoli,* 243 N.J.Super. 563, 580 A.2d 1101 (Law Div.1990) (applying *McClain* to hospital peer review records and holding that opinions, criticisms and evaluations within file were "absolutely protected").

**8.** N.J.STAT. § 2A:84A–22.8 provides that:

"Information and data secured by and in the possession of utilization review committees established by any certified hospital or extended care facility in the performance of their duties shall not be revealed or disclosed in any man-

ner or under any circumstances by any member of such committee except to: (a) a patient's attending physician, (b) the chief administrative officer of the hospital or extended care facility which it serves, (c) the medical executive committee, or comparable enforcement unit of such hospital or extended care facility, (d) representatives of, including intermediaries or carriers for, government agencies in the performance of their duties, under the provisions of Federal and State law, or (e) any hospital service corporation, medical service corporation or insurance company with which said patient has pertinent coverage under a contract, policy, or certificate, the terms of which authorize the carrier to request and be given such information and data."

Congressional enactment,[9] to decide what federal privilege law is. To be sure, the requirement that they do so in light of reason and experience mandates consideration of principles developed by state courts and legislatures.[10] But the goal of the exercise is the informed determination of a single, uniform federal law of evidentiary privileges.[11]

This conclusion is more than amply supported by the cases. In *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), the Supreme Court made it plain that the scope of the spousal privilege in a federal criminal case is a federal question to be determined by the courts with due regard to experience gathered from the states, but without simply adopting the rule of any given state. *Id.* at 47–53, 100 S.Ct. at 910–14. Just this year, the Court determined that confidential communications between psychotherapists and patients are privileged under federal law. *Jaffee v. Redmond*, — U.S. —, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). In doing so, it noted that state decisions "bear on the question whether federal courts should recognize a new privilege or amend the coverage of an existing one" but nevertheless determined the issue as a federal matter without balancing state law privilege against federal interests. *Id.* at — – —, 116 S.Ct. at 1929–30. In 1992, deciding the same issue as *Jaffee*, the Second Circuit in *In re Doe*, 964 F.2d 1325, 1327 (2d Cir.1992), looked only to the general trend of state privilege law, and gave no special deference to New York law (which contained a non-conflicting privilege) in its determination to recognize a psychotherapist-patient privilege. And in *Kaufman v. Edelstein*, 539 F.2d 811, 820 (2d Cir.1976), the Second Circuit refused to apply a New York privilege against compelled expert testimony in a federal question case. Judge Friendly there dismissed the contention that the state rule should govern as incompatible with federal law, stating that "[p]etitioner's suggestion that in this case we should look to state law, and follow [the New York rule] on that basis, flies in the face of Fed.Rule of Evidence 501." *Id.* at 820 n. 13. While the Circuit considered state law in determining whether to recognize the claimed privilege, it looked to the overall trend in the law of all fifty states and to the reasoning underlying it rather than giving any special deference to New York law.[12]

**9.** *Trammel v. United States*, 445 U.S. 40, 47, 100 S.Ct. 906, 910–11, 63 L.Ed.2d 186 (1980); *see Jaffee v. Redmond*, — U.S. —, —, n. 7, 116 S.Ct. 1923, 1927 n. 7, 135 L.Ed.2d 337 (1996).

**10.** However, "the existence and importance of a state privilege is but one of the factors which the court must balance to see whether a new privilege would be justified." 2 JACK B. WEINSTEIN & MARGARET BERGER, WEINSTEIN'S EVIDENCE § 501[3], at 501–48 (1996).

**11.** As Justice Burger noted in *United States v. Gillock*, 445 U.S. 360, 369, 100 S.Ct. 1185, 1191–92, 63 L.Ed.2d 454 (1980), if the drafters of Rule 501 had wanted federal law to mirror state privilege, "Congress could have imported the 'spirit' of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), into federal ... law." *Gillock*, 445 U.S. at 374 [100 S.Ct. at 1194]. Instead, they determined that a unified federal common law of privilege should apply. *See also Jaffee*, — U.S. at —, 116 S.Ct. at 1935 ("If furtherance of state policies is the name of the game, rules of privilege in federal courts should vary from State to State, a la *Erie*," but Congress determined that federal common law, and not *Erie*, should control privilege determinations under Rule 501.) (Scalia, J., dissenting).

**12.** The decision in *31–33 York* does not disturb this conclusion. To the extent that it could be read as supporting the hospitals' argument, it would be overruled by the reasoning in *Jaffee*, which did not adopt state law despite the fact that Illinois law recognized a non-conflicting privilege for psychotherapist-patient communications. In fact, the *Jaffee* Court never mentioned the term "comity" in its analysis and gave Illinois law no special consideration. For the same reasons, *31–33 York* is inconsistent with *Doe* as well.

Even if *31–33 York* were controlling, state law would not necessarily apply in this case. This Court agrees with the numerous federal courts that have determined that the federal interests in discovery in federal question cases like this one— a suit to vindicate the interests of a person of color in even-handed treatment—may outweigh the need for confidentiality of peer review records. *See Purgess v. Sharrock*, 33 F.3d 134 (2d Cir.1994) (state medical peer review privilege outweighed by need for discovery in antitrust action); *Memorial Hospital v. Shadur*, 664 F.2d 1058 (7th Cir.1981) (state medical peer review privilege outweighed by civil rights plaintiffs' need for discovery); *King v. Conde*, 121 F.R.D. 180, 187 (E.D.N.Y.1988) (federal civil rights plaintiff's need for discovery will very often outweigh state privilege law). While the confidentiality of peer review records undoubtedly is an important state interest, in many cases, the only

The conclusion that this Court must determine whether the federal courts should recognize a privilege for medical peer review materials without giving the law of any particular state any greater weight than its logic demands not only is required by cases this Court is obliged to follow. It comports with common sense.

Federal question cases like this one present issues the resolution of which is essential to the carrying out of national policy which, under the Supremacy Clause, controls. The rule contended for by the hospitals would make the availability of evidence relevant to the determination of such issues, no matter how central the evidence, depend upon the varying evidentiary rules of fifty states. In consequence, parties similarly situated in all respects save the location of the federal court in which they happen to be litigating would be faced with a real possibility of different outcomes based purely on that geographical happenstance.

This case illustrates the problem exceptionally well. Hospitals located in two different states here claim privilege for substantially similar materials under their respective state laws. The privileges created by New York and New Jersey law, however, are not coextensive.[13] In consequence, application of state law here would lead to the application of two different rules of privilege and make the parties' access to evidence in resolving a claim under federal statutes depend upon which bank of the Hudson River the evidence happens to be located on.

Accordingly, this Court concludes that the question whether the hospital records at issue are privileged depends upon whether there is a federal privilege for peer review and related materials and, if so, the extent of that privilege. In making such determina-

tions, state privilege law is not to be ignored. Rather, the federal courts must look to the manner in which the states have resolved the issue for themselves and to the interests and policies underlying their determinations. Only by forging independent rules of privilege after taking into account the policy determinations of all of the states can the federal courts develop a uniform federal law of privilege. In other words, federal courts should not ignore the wisdom of state lawmakers. But neither should they create a series of fifty federal common laws.

### 2. There Is No Federal Peer Review Privilege

■ The task of determining whether there is, or should be, a federal privilege protecting the confidentiality of medical peer review materials is greatly simplified in this case, for the Court does not write on a clean slate. In *University of Pennsylvania v. EEOC,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), the Supreme Court held that neither federal common law nor the First Amendment warranted the recognition of a privilege for the peer review materials of a university. It cautioned, moreover, that courts should be "especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself." *Id.* at 189, 110 S.Ct. at 582.. The reasoning of *University of Pennsylvania,* particularly in light of the backdrop of federal legislation peculiar to this case, dictates the result here.[14] *See* Note, *Making Sense of Privilege Under the Structural (Il)logic of the Federal Rules of Evidence,* 105 Harv.L.Rev. 1339, 1352–53 n. 75 (1992) (hereinafter "Harvard Note").

---

proof of employment discrimination that a plaintiff might have may be contained in such records. Thus, even if *31–33 York* were good law, this Court nevertheless would not mechanically apply state privilege law because the states' interests may be outweighed by a conflicting federal interest.

**13.** For example the New Jersey statute renders privileged only "information and data secured by and in the possession of utilization review committees." N.J.Stat. § 2A:84A–22.8 (1994). The

privilege has not been expanded to cover other peer-review materials. *See Todd v. South Jersey Hospital System,* 152 F.R.D. 676, 682 (D.N.J. 1993). New York law protects a variety of medical review functions and provides a privilege against forced testimony regarding the activities of such a committee. *See* N.Y.Educ.L. § 6527, subd. 3.

**14.** Moreover, they make a detailed consideration of the experience of the fifty states unnecessary.

In *University of Pennsylvania*, the EEOC subpoenaed the tenure review files of a woman denied tenure and five male faculty members who allegedly were beneficiaries of disparate treatment. In rejecting the University's privilege claim, the Court noted that testimonial privileges are exceptions to the principle that "the public has a right to every man's evidence" and are to be construed strictly. *Id.* It pointed to Congress' failure to create a privilege for peer review documents in extending Title VII of the Civil Rights Act of 1964 to educational institutions. *Id.* at 189–92, 110 S.Ct. at 582–84. It relied upon the unqualified statutory provision authorizing EEOC access to "relevant" evidence." *Id.* at 194–95, 110 S.Ct. at 584–85. And it viewed with concern the prospect, were the privilege contended for by the University recognized, for demands for similar privilege protection by a host of other employers "who play significant roles in furthering speech and learning in society." *Id.* at 194, 110 S.Ct. at 585.

Most of these considerations strongly support an identical result in this case. The privilege sought here would be no less an exception to the general rule of availability of evidence to litigants. The statutes upon which Dr. Johnson relies create no peer review privilege. The concern about other demands for confidentiality is quite similar.

To be sure, *University of Pennsylvania* relied also upon the extension of Title VII to educational institutions and upon the statutory scope of the EEOC subpoena power, considerations which are absent here. This Court recognizes also that a number of federal cases have said that *University of Pennsylvania* does not eliminate the possibility of a federal medical peer review privilege. *See Brem*, 162 F.R.D. at 101 (considering existence of medical peer review privilege after *University of Pennsylvania* decision); *Pagano v. Oroville Hospital*, 145 F.R.D. 683, 690 (E.D.Cal.1993) (same); *Teasdale v. Marin Gen. Hosp.*, 138 F.R.D. 691, 694 (N.D.Cal. 1991) (limiting *University of Pennsylvania* to "university tenure materials"). Nevertheless, there is an additional circumstance present here which, together with the other factors alluded to, leads the Court to conclude that it is not open to the lower federal courts to recognize a medical peer review privilege in light of *University of Pennsylvania.*

In 1986, Congress enacted the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101 *et seq.* ("HCQIA"), which was inspired by the Congressional finding that "[t]here is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review." 42 U.S.C. § 11101(5). The HCQIA gave qualified immunity from suit to officials who conduct peer reviews that meet the standards outlined in the statute. Yet Congress, in providing protection for those involved in peer review, did not establish a privilege for most documents created in that process. This Court agrees that Congress, in enacting the HCQIA:

> "not only considered the importance of maintaining the confidentiality of the peer review process, but took the action it believed would best balance protecting confidentiality with other important interests. Congress spoke loudly with its silence in not including a privilege against discovery of peer review materials in the HCQIA." *Teasdale*, 138 F.R.D. at 694.

That Congress did consider the relevant competing interests in declining to create a privilege for medical peer review materials in the HCQIA is demonstrated by a number of factors. First, the findings accompanying the statute clearly show that Congress looked at a variety of ways to give doctors protection and incentives to participate in peer review programs. *Id.* § 11101. Second, the statute provides that some materials created in a medical peer review program are confidential, so that Congress must have considered what types of materials should be granted this protection, yet did not accord protection to the materials here in question. *Id.* § 11137(b)(1). Finally, the HCQIA specifically denies immunity under the Civil Rights Act for participants in peer review proceedings, showing that Congress accorded more weight to vindication of civil rights than to the interests in the confidentiality of the

peer review process.[15] *Id.* § 11111(a)(1). Bearing in mind the Supreme Court's admonition that courts should be "especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself," *University of Pennsylvania*, 493 U.S. at 189, 110 S.Ct. at 582, this consideration, together with those discussed above, compels the conclusion that this Court is not free to recognize a privilege for medical peer review materials.[16]

*Some of the Requested Discovery Would Place Too Great a Burden on the Hospitals*

■ The fact that the hospitals enjoy no federal evidentiary privilege shielding the subpoenaed records from discovery, however, does not mean that the parties to this case have a federally-conferred license to rummage through the hospitals' files in complete disregard of the privacy and related policy interests that have moved the legislatures of at least New York and New Jersey to shield at least some of these materials from state process and of the other burdens that such a fishing expedition would impose on the hospitals and their personnel.

■ Although the discovery sought is relevant within the meaning of FED.R.CIV.P. 26(b)(1) and not privileged, there is a material risk that any good to be done by allowing discovery of much of this information would be outweighed by the damage that discovery will cause.

FED.R.CIV.P. 26(b)(2) provides that a court may limit discovery if, *inter alia:*

"the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at

**15.** The legislative history of the HCQIA further demonstrates that Congress considered the factors pertinent to whether such communications should be privileged, but chose only to grant immunity from suit to doctors who participate in peer review. *See* H.R.REP. No. 99–903, 99th Cong., 2d Sess. 3, 9–10 (1986).

**16.** The Court is aware that the Second Circuit held in *Gray v. Board of Higher Education*, 692 F.2d 901 (2d Cir.1982), that the determination whether academic peer review materials are privileged is to be determined on a case by case basis by balancing the plaintiff's need for the particular information against the confidentiality interest of the person from whom the discovery is sought. Courts in this district have reached different conclusions as to whether *Gray* still is good law. *Compare Weinstock v. Columbia University*, No. 95 Civ. 0569 (JFK), 1996 WL 658437 (S.D.N.Y. Nov. 12, 1996) (Keenan, J.); *Black v. New York University*, No. 94 Civ. 9074 (NRB), 1996 WL 294310 (S.D.N.Y. June 3, 1996) (Buchwald, M.J.); *Peterson v. City College of the City University of New York*, 160 F.R.D. 22, 25 (S.D.N.Y.1994) (Patterson, J.); *Fisher v. Vassar College*, 852 F.Supp. 1193, 1222 (S.D.N.Y.1994) (Motley, J.), *rev'd on other grounds*, 70 F.3d 1420 (2d Cir.1995) (*Gray* overruled), *with Spencer v. City University of New York/College of Staten Island*, No. 94 Civ. 4477 (DLC) (AJP), 1995 WL 169010 (S.D.N.Y. Apr. 10, 1995) (Peck, M.J.); *Torres v. City of New York*, No. 90 Civ. 2278 (LAP), 1994 WL 502621 (S.D.N.Y. Sept. 14, 1994) (Katz, M.J.) (*Gray* survives). This Court concludes that *Gray* almost surely was overruled by *University of Pennsylvania* and that any doubt was removed by Jaffee. The *Gray* balancing test made the existence of privilege depend on an *ad hoc* balancing in any given case. This approach was rejected specifically in *Jaffee*, where the Court wrote:

"We reject the balancing component of the privilege implemented by [the Seventh Circuit below] and a small number of States. Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege. As we explained in *Upjohn*, if the purpose of the privilege is to be served, the participants in the confidential conversation 'must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.'" *Jaffee*, —— U.S. at ——, 116 S.Ct. at 1932 (footnote omitted) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 393, 101 S.Ct. 677, 684, 66 L.Ed.2d 584 (1981)). *Accord*, Association of the Bar of the City of New York, Report of the Proposed Evidence Committee 83 (Sept. 30, 1983) ("[P]rivileges obviously would be of diminished value if they may be denied in any case in accordance with the unpredictable conceptions of what "the interests of justice" may require. And if judges are given the power to deny the privilege on such a ground, confidential communications could not be made with any assurance that they would be protected.")
Even if *Gray* still were good law, the Court's disposition of this matter would be identical for the reasons expressed in the next section of this opinion.

stake in the litigation, and the importance of the proposed discovery in resolving the issues."

This power, moreover, may be employed where the burden is not measured in the time or expense required to respond to requested discovery, but lies instead in the adverse consequences of the disclosure of sensitive, albeit unprivileged, material. *See Herbert v. Lando,* 441 U.S. 153, 177, 99 S.Ct. 1635, 1649, 60 L.Ed.2d 115 (1979) (rejecting editorial process privilege, but suggesting that district court nevertheless limit discovery as appropriate); Harvard Note, 105 HARV.L.REV. at 1354–55 & nn. 85–86. As Magistrate Judge Dolinger wrote in *Apex Oil Co. v. DiMauro,* 110 F.R.D. 490 (S.D.N.Y. 1985):

"Where a party establishes that disclosure of requested information could cause injury to it or otherwise thwart desirable social policies, the discovering party will be required to demonstrate that its need for the information, and the harm that it would suffer from the denial of such information, outweigh the injury that disclosure would cause either to the other party or to the interests cited by it." *Id.* at 496.

Similarly, the Advisory Committee Note to the 1970 amendment to Rule 26(b) stated that the district courts have:

"broad powers ... to regulate or prevent discovery even though the materials sought are within the scope of 26(b), and these powers have always been freely exercised. For example, a party's tax return is generally held not privileged, [citations omitted] and yet courts have recognized that interests in privacy may call for an extra measure of protection."

Accordingly, the Court must consider whether the burdens imposed on the hospitals' privacy and other interests sufficiently outweigh the needs of the parties to warrant relief. The issue, moreover, varies depending upon the foci of the various discovery demands.

Defendants seek records concerning the granting of vascular/thoracic surgery privileges at Pascack Valley and Jamaica Hospital in rough temporal proximity to Nyack Hospital's denial of reinstatement. The signifi-

cance of those decisions depends upon the degree of comparability of the information before all three hospitals and the congruency, or lack thereof, of the standards they applied. Depending upon the evidence, the Pascack Valley and Jamaica decisions may be highly probative. The parties need for the data upon which they acted and the standards they applied therefore is great, and it outweighs the interests of those hospitals in maintaining confidentiality. *See* Note, *Developments in the Law—Privileged Communications,* 98 HARV.L.REV. 1450, 1628 (1985).

■ As noted above, defendants' chief reason for seeking discovery concerning Dr. Johnson's performance at other hospitals is defensive. They wish to develop a basis for challenging Dr. Johnson's contention that he had practiced elsewhere without problems. To the extent that they seek information concerning malpractice claims, suspensions and adverse administrative actions involving Dr. Johnson, their interest is quite substantial. Their interest is not so great when it comes to less conclusive events. It is not clear at this stage, moreover, that their interest is sufficiently great to warrant disclosure by the hospitals of information at the core of the peer review issue, viz. evaluations, opinions or criticism of Dr. Johnson by other physicians. Nor do defendants have needs sufficient to justify many of the sweeping demands made by their *subpoenae.* Accordingly, the motions to quash will be granted in part as to these demands.

Dr. Johnson's interest in obtaining information about the performance of the Rockland surgeons at other hospitals is analogous to defendants' interest in obtaining information about Dr. Johnson's performance elsewhere. The same conclusion follows.

### Conclusion

For the foregoing reasons, defendants' motion *in limine* is granted to the extent that the Court will not receive evidence of the activities of Drs. Steinglass, Ginsburg, Gorenstein, Schwartz and Trent at other hospitals except to the extent the information was known to Nyack Hospital and otherwise is denied. The motions by Pascack Valley and Jamaica Hospitals to quash the *subpoenae duces tecum* served upon them are denied, except that paragraphs D, E, G, H and I and

the phrase "any other hospital" appearing in paragraphs A and B are quashed. The motions by the other hospitals to quash the *subpoenae duces tecum* served upon them by defendants are denied, except that (1) paragraphs D, E, F, G, H and I and the phrase "any other hospital" appearing in paragraphs A and B are quashed, and (2) evaluations, opinions or criticism of Dr. Johnson by other physicians which have not been disclosed outside the subpoenaed institution (except to professional licensing or disciplinary authorities) may be redacted. The motions by the other hospitals to quash the *subpoenae duces tecum* served upon them by plaintiff are denied, except that (1) paragraphs D, G, H, I, J, K and L and the phrase "any other hospital" appearing in paragraph E are quashed, and (2) evaluations, opinions or criticism of Drs. Steinglass, Ginsburg, Gorenstein, Schwartz and Trent or any other member of Rockland Thoracic Associates by other physicians which have not been disclosed outside the subpoenaed institution (except to professional licensing or disciplinary authorities) may be redacted.

SO ORDERED.