ON MOTION FOR CLARIFICATION, REHEARING AND/OR REHEARING EN BANC, AND FOR CERTIFICATION OF QUESTIONS TO THE FLORIDA SUPREME COURT
 

 LEWIS, J.
 

 We deny Petitioner’s Motion for Clarification, Rehearing and/or Rehearing
 
 En Banc,
 
 and for Certification of Questions to the Florida Supreme Court. On our own motion, we withdraw our previous opinion and substitute the following for it.
 

 This consolidated action arises out of a medical malpractice suit between West Florida Regional Medical Center (Petitioner), d/b/a West Florida Hospital, and Lynda and Rodney See (Respondents). Petitioner seeks certiorari review of two discovery orders, arguing that the trial court departed from the essential requirements of the law in eight respects: (1) in denying its work-produet objection to the production of records of adverse medical incidents ordered to be produced pursuant to Article X, section 25 of the Florida Constitution; (2) in ordering Petitioner to produce records beyond the scope of Respondents’ requests; (3) in denying Petitioner the right, under section 381.028(7)(b)l, Florida Statutes (2006), to use the process identified in section 395.0197, Florida Statutes (2006), to decide which documents are considered records of adverse medical incidents; (4) in denying Petitioner the right to require prepayment of the costs of production, as authorized by section 381.028(7)(c)l; (5)
 
 *681
 
 in rejecting Petitioner’s argument that Amendment 7 is preempted by the federal Health Care Quality Improvement Act of 1986; (6) in rejecting Petitioner’s argument that Amendment 7 violates the Contract Clause of the United States Constitution, as applied in this case; (7) in ordering Petitioner to produce specific evidence of the training of two doctors to perform a certain surgical procedure; and (8) in ordering Petitioner to produce a blank copy of its application for medical staff privileges. We grant, in part, the petition seeking a writ of certiorari to quash the ruling requiring the production of evidence of the doctors’ training. In all other respects, the petitions are denied. We write to explain our decision.
 

 Facts
 

 According to Respondents’ complaint, Dr. Mary Jane Benson performed a lapa-roscopic cholecystectomy on Mrs. See at West Florida Hospital on or about August 19, 2003. Respondents allege that during the coui'se of the procedure, Mrs. See’s common bile duct was severed and that Dr. Benson then consulted with Dr. Rees to determine an appropriate course of action. Respondents allege that Drs. Benson and Rees then performed an open laparotomy and a Roux-en-y hepaticojeju-nostomy on Mrs. See. They further allege that Drs. Benson and Rees performed these procedures improperly, causing damage to Mrs. See’s liver, and that the damage to Mrs. See’s liver was exacerbated by Dr. Benson’s failure to monitor Mrs. See’s condition regularly after the surgeries. Respondents’ claims against Petitioner include vicarious liability for Dr. Benson’s negligence and direct liability for the negligent grant of medical staff privileges to Drs. Benson and Rees.
 

 Respondents requested, pursuant to Amendment 7, that Petitioner produce “any and all adverse incident reports on [itself] (West Florida Hospital), Mary Jane Benson. M.D. and/or George C. Rees, M.D. ... pertaining to laparoscopic chole-cystectomy and Roux-en-y hepaticojeju-nostomy.” Respondents also requested the entire credentialing files for Drs. Benson and Rees and, in particular, evidence regarding the training of both doctors to perform a Roux-en-y hepaticojejunostomy. In addition, Respondents sought a blank application for medical staff privileges.
 

 Petitioner objected to each of these discovery requests and moved for protective orders. Petitioner argued that all of the above requests should be denied because the requested documents were protected from discovery by statute. Petitioner acknowledged that Amendment 7 abrogated the x-elevant statutes to some extent, but argued that Amendment 7 violates the United States Constitution. Petitioner also raised a work-product objection, arguing that Amendment 7 does not affect the work-product privilege. Petitioner did not file a privilege log. Petitioner acknowledged the lack of a privilege log, opined that it was not yet required to file one due to the burdensomeness
 
 [1]
 
 of Respondents’ requests, and asked the trial court to waive any requirement to file a privilege log if it determined that such a requirement applied. Additionally, Petitioner argued that, under sections 381.028(7)(b)l and 395.0197, Florida Statutes (2006), it was not required to produce any records other than those of “incidents in Code 15 reports and the annual reports” that are required under subsections (5) and (7) of section 395.1097. Finally, Petitioner claimed that if the trial court ordered it to
 
 *682
 
 provide any of the requested records, Respondents were required to pay the costs of production in advance, pursuant to section 381.028(7)(c)l.
 

 These discovery matters proceeded to a hearing. In discussing Respondents’ requests for records of adverse medical incidents involving the hospital and Drs. Benson and Rees pertaining to laparoscopic cholecystectomy and Roux-en-y hepaticoje-junostomy, Respondents’ attorney stated, “I’m not interested necessarily in adverse incident reports of everybody in the hospital now that I see what the expense is going to be.” Shortly thereafter, he clarified, “I would like any type of peer review that was done on this particular incident. I’m not necessarily interested in other incidents. I’ll limit it to this particular incident, the one on Mrs. See.”
 

 On February 6, 2009, the trial court issued its “Order Granting, in Part, and Denying, in Part, West Florida Regional Medical Center, Inc.’s Amended Motion for Protective Order.” The trial court rejected Petitioner’s federal constitutional arguments and denied the motion for protective order as to “documents relating to ‘adverse medical incidents’ as defined in Article X, Section 25(3)(c), Florida Constitution, of Mary Jane Benson, M.D. and George C. Rees, M.D. for two (2) years preceding the date of the first surgery performed on Mrs. See by the doctors in this case.” The order is silent as to Petitioner’s work-product objection and its arguments regarding section 381.028(7)(b)l & (c)l.
 

 On February 9, 2009, the trial court issued its “Order on West Florida Regional Medical Center, Inc.’s Amended Motion to Quash and for Protective Order.” In this order, the trial court denied Petitioner’s motion for protective order as to the evidence of the doctors’ training to perform the Roux-en-y hepaticojejunostomy procedure and as to the blank application for medical staff privileges.
 

 Petitioner filed separate petitions for writ of certiorari with this Court challenging each order, and upon Petitioner’s motions, we consolidated the actions.
 

 Jurisdiction
 

 To establish entitlement to cer-tiorari relief, the petitioner must demonstrate that the order under review departs from the essential requirements of law and will cause irreparable harm, i.e. harm that cannot be remedied on appeal.
 
 See Chavez v. J & L Drywall & Travelers Ins. Co.,
 
 858 So.2d 1266 (Fla. 1st DCA 2003). The irreparable-harm inquiry is an issue of jurisdiction, and thus, must be undertaken first.
 
 Olges v. Dougherty,
 
 856 So.2d 6, 10 (Fla. 1st DCA 2003). Often, orders granting discovery are reviewed by certiorari under the rationale that once discovery is wrongfully granted, the aggrieved party is “beyond relief.”
 
 See Martin-Johnson, Inc. v. Savage,
 
 509 So.2d 1097, 1099 (Fla.1987). The Florida Supreme Court has cautioned, however, that not every erroneous grant of discovery is reviewable by certiorari.
 
 Id.
 
 at 1100. Where the injury caused by an erroneous discovery order is the unnecessary expenditure of time or money or even a violation of a party’s “valid privacy interest in avoiding unnecessary disclosure of matters of a personal nature,” the injury is insufficient to invoke the district courts’ certiorari jurisdiction.
 
 Id.
 
 In contrast, where the complaining party’s interest in avoiding discovery involves trade secrets, work product, or information about a confidential informant, an order compelling discovery is reviewable by certiorari.
 
 See id.
 
 Orders that require the production of “ ‘cat out of the bag’ material that could be used to injure another person or party outside the context of the litigation” are reviewable by
 
 *683
 
 certiorari.
 
 Allstate Ins. Co. v. Langston,
 
 655 So.2d 91, 94 (Fla.1995).
 

 Applying these standards, we conclude that two of the eight challenged rulings are not reviewable by certiorari. The trial court’s order to Petitioner to produce documents beyond the scope of Respondents’ request will not cause irreparable harm of the type that may be remedied by a writ of certiorari. The only harm this order will cause is unnecessary expense. To the extent the ruling may require Petitioner to produce privileged or protected documents, it is adequately addressed by our review of the rulings on the constitutionality of Amendment 7. Similarly, the trial court’s denial of Petitioner’s request for an order requiring the prepayment of costs of production will not cause the type of harm that may be remedied by certiorari; again, the only harm that may result from the denial of this request is monetary. The remaining rulings all concern documents that would be protected, either by the work-product privilege or by statutory confidentiality provisions, in the absence of Amendment 7. Therefore, we have jurisdiction to review these rulings by certiorari and will discuss each ruling in turn.
 

 Work Product Privilege
 

 Petitioner argues that the trial court’s order implicitly denied its work-product objection by broadly requiring the production of records of adverse medical incidents. We will not address the viability of the work-product privilege in the wake of Amendment 7 because we do not interpret the trial court’s order as ruling on this issue. In
 
 Gosman v. Luzinski,
 
 937 So.2d 293, 295 (Fla. 4th DCA 2006), the court held that a party need not file a privilege log until the trial court has resolved threshold issues as to whether the requested documents are “otherwise discoverable.”
 
 See also Columbia Hosp. Corp. of S. Broward v. Fain,
 
 16 So.3d 236, 240 (Fla. 4th DCA 2009). A challenge to the burdensomeness of a discovery request is such a threshold issue,
 
 id.,
 
 as is a challenge to the constitutionality of Amendment 7 if it relates to the discovery requests at issue,
 
 see N. Broward Hosp. Dist. v. Durham,
 
 991 So.2d 967 (Fla. 4th DCA 2008). We interpret the trial court’s order as ruling on these threshold issues only.
 

 Petitioner’s obligation to file a privilege log did not attach until the trial court decided these threshold issues. Nothing in the trial court’s order prohibits Petitioner from filing a privilege log now and raising specific privilege objections to specific documents. Thus, we find no departure from the essential requirements of the law as to this issue.
 

 Section 381.028(7)(b)l, Florida Statutes (2006)
 

 The next issue we address is whether the trial court departed from the essential requirements of the law in declining to ratify Petitioner’s interpretation of section 381.028(7)(b)l as limiting the records it must produce under Amendment 7 to the “Code 15” reports and annual reports required by subsections (5) and (7) of section 395.1097. Here again, the trial court’s order was silent as to this issue. The trial court’s order provided, in pertinent part, that Petitioner was to produce “documents relating to ‘adverse medical incidents’ as defined in Article X, Section 25(3)(c), Florida Constitution.” As our sister court noted in
 
 Fain,
 
 Amendment 7 expressly provides that it is “not limited to” incidents that already must be reported under law. 16 So.3d at 241. The trial court’s order used Amendment 7 as the basis for ordering production of documents. If section 381.028(7)(b)l requires
 
 *684
 
 less of hospitals, as Petitioner suggests, then it conflicts with Amendment 7.
 
 See id.
 
 Like the
 
 Fain
 
 court, we observe that Petitioner’s argument calls for an unconstitutional application of the statute. As the
 
 Fain
 
 court explained, “the legislature may not limit the scope of discoverability of adverse incident reports in a manner inconsistent with the amendment.”
 
 Id.
 
 (citing
 
 Fla. Hosp. Waterman, Inc. v. Buster,
 
 984 So.2d 478 (Fla.2008)). The trial court did not depart from the essential requirements of the law in declining to limit the scope of Amendment 7 by adopting Petitioner’s interpretation of section 381.028(7)(b)l. Thus, we deny the petition as to this ruling.
 

 Federal Preemption
 

 Next, we address Petitioner’s argument that Amendment 7 violates the Supremacy Clause of the United States Constitution because it is impliedly preempted by the federal Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. §§ 11101-11152. On this issue, too, we agree with both the trial court and the Fourth District in
 
 Fain,
 
 which rejected the same argument.
 

 Petitioner grounds its Supremacy Clause argument in the doctrine of conflict preemption. To determine whether a state law is preempted by a federal statute, courts consider Congressional intent, which should be gleaned from “the explicit statutory language and the structure and purpose of the statute.”
 
 Gade v. Nat’l Solid Wastes Mgmt. Ass’n,
 
 505 U.S. 88, 96, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (citations omitted). Conflict preemption exists where “compliance with both federal and state regulations is a physical impossibility” or where state law creates “an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.”
 
 Id.
 
 (citations omitted).
 

 Amendment 7, which is titled “Patients’ right to know about adverse medical incidents,” provides, in its entirety, as follows:
 

 (a) In addition to any other similar rights provided herein or by general law, patients have a right to have access to any records made or received in the course of business by a health care facility or provider relating to any adverse medical incident.
 

 (b) In providing such access, the identity of patients involved in the incidents shall not be disclosed, and any privacy restrictions imposed by federal law shall be maintained.
 

 (c) For purposes of this section, the following terms have the following meanings:
 

 (1) The phrases “health care facility” and “health care provider” have the meaning given in general law related to a patient’s rights and responsibilities.
 

 (2) The term “patient” means an individual who has sought, is seeking, is undergoing, or has undergone care or treatment in a health care facility or by a health care provider.
 

 (3) The phrase “adverse medical incident” means medical negligence, intentional misconduct, and any other act, neglect, or default of a health care facility or health care provider that caused or could have caused injury to or death of a patient, including, but not limited to, those incidents that are required by state or federal law to be reported to any governmental agency or body, and incidents that are reported to or reviewed by any health care facility peer review, risk management, quality assurance, credentials, or similar committee, or any representative of any such committees.
 

 
 *685
 
 (4) The phrase “have access to any records” means, in addition to any other procedure for producing such records provided by general law, making the records available for inspection and copying upon formal or informal request by the patient or a representative of the patient, provided that current records which have been made publicly available by publication or on the Internet may be “provided” by reference to the location at which the records are publicly available.
 

 Art. X, § 25, Fla. Const.
 

 The HCQIA is a federal statute enacted in response to “[t]he increasing occurrence of medical malpractice and the need to improve the quality of medical care” across the nation. 42 U.S.C. § 11101(1). In setting forth its findings, Congress observed that these “nationwide problems” could be “remedied through effective professional peer review.”
 
 Id.
 
 at § 11101(3). The HCQIA provides for immunity from civil damages for peer review bodies and those who furnish information to peer review bodies and requires certain entities to file reports regarding medical malpractice for inclusion in a national database.
 
 Id.
 
 at §§ 11111, 11132, 11133. It also requires hospitals to obtain and review the information reported under the HCQIA when they hire physicians and once every two years thereafter.
 
 Id.
 
 at § 11135(a)(2).
 

 Petitioner argues that conflict preemption exists here in that Amendment 7 stands as an obstacle to the accomplishment of the HCQIA’s purpose of promoting effective peer review. There is no dispute over whether the promotion of effective peer review is one of the purposes of the HCQIA. The trial court reached this conclusion; the Respondents do not contest it; and the language of the HCQIA supports it, see 42 U.S.C. § 11101(1), (3) (stating the Congressional findings that medical malpractice and the need to improve the quality of medical care have become nationwide problems, which “can be remedied through effective professional peer review”). Thus, the only question for this Court is whether the trial court properly determined that Amendment 7 is not an obstacle to effective peer review as envisioned by the HCQIA.
 

 In enacting the HCQIA, Congress did not provide for confidentiality of peer review records or communications.
 
 See
 
 42 U.S.C. §§ 11101-11152. It did, however, provide that participants in peer review actions and those who provide information to peer review bodies shall be immune from liability for damages with respect to their participation in such actions, except where a person has knowingly provided false information to a peer review body.
 
 Id,,
 
 at § 11111(a). The HCQIA further provides as follows:
 

 Except as specifically provided in this subchapter, nothing in this subchapter shall be construed as changing the liabilities or immunities under law or as preempting or overriding any State law which provides incentives, immunities, or protection for those engaged in a professional review action that is in addition to or greater than that provided by this subchapter.
 

 Id.
 
 at § 11115(a). Thus, Congress expressly dealt with the issue of immunity from liability for communications related to peer review and with the issue of preemption of laws concerning such protections.
 
 See id.
 
 Congress further expressed the following intent:
 

 Nothing in this chapter shall be construed as affecting in any manner the rights and remedies afforded patients under any provision of Federal or State law to seek redress for any harm or injury suffered as a result of negligent treatment or care by any physician,
 
 *686
 
 health care practitioner, or health care entity, or as limiting any defenses or immunities available to any physician, health care practitioner, or health care entity.
 

 Id.
 
 at 11115(d). In this provision, Congress again fell short of addressing the confidentiality or privileged status (or lack thereof) of records generated in peer review processes, but it did express an intent not to undermine the ability of patients to seek redress for medical malpractice.
 
 See id.
 

 Several federal courts have recognized the lack of a medical peer review privilege in the HCQIA and have deemed this omission a policy choice by Congress.
 
 See, e.g., In re Admin. Subpoena Blue Cross Blue Shield of Mass., Inc.,
 
 400 F.Supp.2d 386, 391-92 (D.Mass.2005);
 
 Nilavar v. Mercy Health Sys.-W. Ohio,
 
 210 F.R.D. 597 (S.D.Ohio 2002);
 
 Teasdale v. Marin Gen. Hosp.,
 
 138 F.R.D. 691, 694 (ND.Cal.1991). One court emphasized that “Congress spoke loudly with its silence in
 
 not
 
 including a privilege against discovery of peer review materials in the HCQIA.”
 
 Teasdale,
 
 138 F.R.D. at 694. The plain language of the HCQIA supports this conclusion, as the following analysis from
 
 Johnson v. Nyack Hosp.,
 
 169 F.R.D. 550, 560-61 (S.D.N.Y.1996), explains:
 

 That Congress did consider the relevant competing interests in declining to create a privilege for medical peer review materials in the HCQIA is demonstrated by a number of factors. First, the findings accompanying the statute clearly show that Congress looked at a variety of ways to give doctors protection and incentives to participate in peer review programs.
 
 Id.
 
 § 11101. Second, the statute provides that some materials created in a medical peer review program are confidential, so that Congress must have considered what types of materials should be granted this protection, yet did not accord protection to the materials here in question.
 
 Id.
 
 § 11137(b)(1). Finally, the HCQIA specifically denies immunity under the Civil Rights Act for participants in peer review proceedings, showing that Congress accorded more weight to vindication of civil rights than to the interests in the confidentiality of the peer review process.
 

 The
 
 Johnson
 
 court also concluded that the HCQIA’s legislative history “further demonstrates that Congress considered factors pertinent to whether such communications should be privileged, but chose not to grant immunity from suit to doctors who participate in peer review.”
 
 Id.
 
 at 561 n. 15 (citing H.R. Rep. No. 99-903, 99th Cong., 2d Sess. 3, 9-10 (1986)). This conclusion is supported, in particular, by the following language from House Report Number 99-903:
 

 Section 101. Professional Review
 

 Subsection (a) provides limited, but essential, protection from liability for persons conducting professional review actions based on the competence or professional conduct of individual physicians .... The Committee feels that the purposes of this bill require protection for persons engaging in professional review. Under current state law, most professional review activities are protected by immunity and confidentiality provisions. A small but growing number of recent federal antitrust actions, however, have been used to override these protections. Because the reporting system required under this legislation will most likely increase the volume of such suits, the Committee feels that some immunity for the peer review process is necessary. Initially, the Committee considered establishing a very broad protection from
 
 *687
 
 suit for professional review actions. In response to concerns that such protection might be abused and serve as a shield for anti-competitive economic actions under the guise of quality controls, however, the Committee restricted the broad protection. As redrafted, the bill now provides protection only from damages in private actions, and only for proper peer review, as defined in the bill.
 

 H.R. Rep. No. 99-903, 99th Cong., 2d Sess. 3, 8-9 (1986). This language illustrates that Congress carefully limited the amount of protection to be accorded the peer review process to account for competing interests. One of the competing interests Congress considered, as revealed by the plain language of section 11115(d), was a patient’s interest in seeking redress for malpractice.
 

 Petitioner contends that Congress relied on the availability of peer review privileges under state law in deciding not to include such a privilege in the HCQIA. This position is untenable. Congress was well aware that state laws could be repealed. Moreover, as the above-quoted language from House Report Number 99-903 reveals, Congress considered the fact that many states also accorded immunity for peer review activities, yet it still found it important to include an immunity provision in the HCQIA. If Congress had found a peer review privilege necessary to the effectiveness of peer review processes, it would have included such a privilege in the HCQIA. Because Petitioner has not shown that effective peer review is impossible without the confidentiality of peer review materials, we agree with the trial court’s ruling that the HCQIA does not preempt Amendment 7. Accordingly, we deny the petition as to this ruling.
 

 Federal Contract Clause
 

 Next, we address Petitioner’s argument that application of Amendment 7 in this case violates the Contract Clause of the United States Constitution, as it prevents the hospital from honoring the confidentiality provisions in its medical staff bylaws. The Contract Clause of the United States Constitution provides that “[n]o State shall pass any Law impairing the Obligation of Contracts.” U.S. Const, art. I, § 10, cl. 1. The “threshold inquiry” of Contract Clause analysis is “whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.”
 
 Energy Reserves Group, Inc. v. Kansas Power & Light,
 
 459 U.S. 400, 411, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (citation omitted). Once a court determines that a substantial impairment has been effected, it must consider whether there is “a significant and legitimate public purpose behind the regulation.”
 
 Id.
 
 If the court identifies a legitimate public purpose, it must find that the effect on the parties’ contractual obligations is “of a character appropriate to the public purpose” justifying the legislation in order to uphold it.
 
 See id.
 
 at 412, 103 S.Ct. 697.
 

 Here, we need to look no further than the “threshold inquiry” to conclude that Amendment 7 does not violate the Contract Clause as applied in this case. The United States Supreme Court has noted, “In determining the extent of the impairment, [courts] are to consider whether the industry of the complaining party has entered has been regulated in the past.”
 
 Id.
 
 at 411, 103 S.Ct. 697. Explaining this consideration, the Court has observed, “One whose rights ... are subject to state restrietion[ ] cannot remove them from the power of the State by making a contract about them.”
 
 Id.
 
 (quoting
 
 Hudson Water Co. v. McCarter,
 
 209 U.S. 349, 357, 28 S.Ct. 529, 52 L.Ed. 828 (1908)).
 

 
 *688
 
 The medical profession is heavily regulated by the State of Florida. Thus, under United States Supreme Court precedent, hospitals and physicians cannot purport to regulate themselves through private contracts and then seek shelter from state laws under those contracts. Moreover, an examination of the contractual language
 
 [2]
 
 at issue in the instant case reveals that such an attempt was never intended. The confidentiality provisions of the Hospital’s bylaws provide, in pertinent part, as follows:
 

 12.2 Confidentiality of information
 

 Any act, communication, report, recommendation or disclosure concerning any applicant for membership or clinical privileges given or made by anyone in good faith and without malice, with or without the request of any authorized representative of the Medical Staff, the Administration, the Board of Trustees, the Hospital or any other healthcare facility or provider for the purposes of providing, achieving or maintaining quality patient care in the Hospital or at any other healthcare facility shall
 
 be confidential and protected from discovery to the fullest extent permitted by law
 
 ....
 

 12.3 Breach of Confidentiality
 

 Inasmuch as effective peer review, credentialing and performance measurement and improvement activities must be based on free and candid discussions, any breach of confidentiality of the discussions, deliberations, or records of any Medical Staff meeting, department, or committee is outside appropriate standards of conduct for this Medical Staff and shall be deemed disruptive to the operation of the Hospital and as having an adverse impact on the quality of patient care. Such breach or threatened breach shall subject the individual responsible ... to disciplinary action....
 

 (Pet. 33-34, emphasis added). The plain language of these confidentiality provisions expressly limits the guarantee of confidentiality to the “extent permitted by law.” Thus, so long as the relevant law is valid, its implementation does not impair this contract. The Florida Supreme Court has already declared that Amendment 7 does not impact a substantive, vested light in the confidentiality of peer review records.
 
 See Blister,
 
 984 So.2d at 490-92. Because the challenged provisions of the contract at issue are expressly tied to the viability of such provisions under the prevailing law, Petitioner’s arguments under the Contract Clause are meritless. We deny the petition as to the Contract Clause ruling as well.
 

 Evidence of Doctors’ Training
 

 Hawng established that Petitioner’s federal constitutional attacks have no merit, we will now address whether the order to Petitioner to produce certain evidence was required by Amendment 7. Prior to the enactment of Amendment 7, the Florida Legislature had passed several statutes protecting documents maintained by hospitals from discovery in civil litigation, including sections 395.0191(8), 395.0193(8), and 766.101(5). Petitioner’s claims of privilege for the documents contained in the Hospital’s credentialing files arise under sections 395.0191(8) and 766.101(5), Florida Statutes, which were both enacted prior to the passing of Amendment 7. Section 395.0191(8) provides, in pertinent part, as follows:
 

 The investigations, proceedings, and records of the board [involved in determining staff membership or clinical privi
 
 *689
 
 leges], or agent thereof ... shall not be subject to discovery or introduction into evidence in any civil action against a provider of professional health services arising out of matters which are the subject of evaluation and review by such board....
 

 § 395.0191(8), Fla. Stat. (2006). Section 766.101(5) contains essentially the same language, except that it applies to medical review committees instead of boards that consider awarding staff membership and clinical privileges. Neither provision prohibits discovery or admissibility of documents considered by such boards and committees if those documents are obtained from other sources. § 395.0191(8); § 766.101(8);
 
 see Fla. Hosp. Waterman, Inc. v. Buster,
 
 984 So.2d 478, 490-91 (Fla.2008). These provisions essentially provide only that healthcare facilities cannot be compelled to provide the documents or information they have considered in their credentialing and review functions.
 
 See
 
 § 395.0191(8); § 766.101(8);
 
 Buster,
 
 984 So.2d at 490-91.
 

 Before Amendment 7 went into effect, courts interpreted these statutory confidentiality provisions broadly.
 
 See, e.g., Cruger v. Love,
 
 599 So.2d 111, 113-14 (Fla.1992). In
 
 Cruger,
 
 the Florida Supreme Court noted that the statutes did not define what constituted a record of a committee or board and, accordingly, looked to the legislative intent to determine what documents were privileged.
 
 Id.
 
 It then determined that the Florida Legislature had designed these statutes to “provide that degree of confidentiality necessary for ... full, frank medical peer evaluation.”
 
 Id.
 
 (quoting
 
 Holly v. Auld,
 
 450 So.2d 217, 220 (Fla.1984)). The court further observed, “The policy of encouraging full candor in peer review proceedings is advanced only if all documents considered by the committee or board during the peer review or credentialing process are protected. Committee members and those providing information to the committee must be able to operate without fear of reprisal.”
 
 Id.
 
 Based on these considerations, the supreme court held that the statutory provisions in question “protect[ ] any document considered by the committee or board as part of its decision-making process.”
 
 Id.
 

 It is undisputed that prior to the enactment of Amendment 7, Petitioner could not have been ordered to produce the requested evidence of the doctors’ training to perform the specific procedure in question, as this evidence would come from the hospital’s credentialing file and would be protected under section 395.0191(8), Florida Statutes (2006). This statutory provision is still in effect to the extent that it does not prohibit the production of records relating to adverse medical incidents under Amendment 7.
 
 See Morton Plant Hosp. Ass’n., Inc. v. Shahbas ex rel. Shahbas,
 
 960 So.2d 820, 827 (Fla. 2d DCA 2007). Thus, we must decide whether the records of the doctors’ training to perform the procedure in question constitute records “relating to any adverse medical incident,” within the meaning of Amendment 7. At this juncture, the definition of “adverse medical incident” bears repeating:
 

 (3) The phrase “adverse medical incident” means medical negligence, intentional misconduct, and any other act, neglect, or default of a health care facility or health care provider that caused or could have caused injury to or death of a patient, including, but not limited to, those incidents that are required by state or federal law to be reported to any governmental agency or body, and incidents that are reported to or reviewed by any health care facility peer review, risk management, quality assur-
 
 *690
 
 anee, credentials, or similar committee, or any representative of any such committees.
 

 Art. X, § 25, Fla. Const. This definition is quite broad, but it does contain some limiting language. First, the word “incident” itself indicates an isolated event. Additionally, an event may constitute an “adverse medical incident” only if it is shown that the event “caused or could have caused injury to or death of a patient.” Thus, we interpret the phrase “adverse medical incident” as a specific incident involving a specific patient that caused or could have caused injury to or the death of that patient.
 
 Accord Shahbas,
 
 960 So.2d at 827 (quashing an order that required the production of credentialing documents that did not “contain information about particular adverse medical incidents”). An adverse medical incident may be a negligent act or omission, as the definition indicates, but the act or omission must be connected with a patient and must be the cause or near-cause of an injury or death.
 

 Here, there is no identifiable adverse medical incident to which the records of the doctors’ training to perform a Roux-en-y hepaticojejunostomy relate. Respondents argue that the relevant adverse medical incident is the negligent credentialing of the doctors. They contend that negligent credentialing meets the definition provided in paragraph (c)(3) of Amendment 7 because negligent credentialing is an “act, neglect, or default of a health care facility or health care provider.” Even if we were to accept that negligent credentialing could fall under the definition of an adverse medical incident, the negligent credentialing alleged in the instant case could not serve as the relevant incident because it has not yet been established, as it is one of the ultimate issues in this non-final case. The same logic applies to any contention that the performance of the Roux-en-y hepaticojejunostomy was the relevant adverse medical incident. As Petitioner has aptly observed, Amendment 7 does not envision that a party may establish an adverse medical incident for the purposes of discovery simply by asserting a particular cause of action; causes of action do not determine the scope of the amendment. If the amendment were intended to be interpreted so broadly, it would not have been limited to records relating to adverse medical incidents; instead, it would provide access to all records relevant to any causes of action asserted against health care providers.
 

 If we were to accept Respondents’ interpretation of Amendment 7, there would be no limit to what could be discovered in civil litigation under the amendment, and we would be in conflict with both the Third and Fourth Districts, which have found limits to the amendment. Both courts have concluded that an order requiring the production of an entire credentialing file on a particular physician was beyond the scope of Amendment 7. See
 
 Shahbas,
 
 960 So.2d at 827;
 
 Baptist Hosp. of Miami, Inc. v. Garcia,
 
 994 So.2d 390, 393 (Fla. 3d DCA 2008). If Amendment 7 required the production of any documents relating to a cause of action for medical malpractice or negligent credentialing, then the limits recognized by
 
 Shahbas
 
 and
 
 Garcia
 
 would be improper. As we have explained, we agree with the courts in
 
 Shahbas
 
 and
 
 Garcia
 
 that Amendment 7 is not limitless.
 

 Because, in this case, there is no established adverse medical incident to which the documents of the doctors’ training relate, the trial court departed from the essential requirements of the law in ordering the production of those documents. Accordingly, we quash this portion of the trial court’s order.
 

 Blank Application for Medical Staff Privileges
 

 Finally, we consider whether the trial court departed from the essential re
 
 *691
 
 quirements of the law in ordering Petitioner to provide Respondents a blank application for medical staff privileges. In analyzing this issue, we must determine whether the blank application form is statutorily protected, and if so, whether Amendment 7 abrogates that statutory protection.
 

 In
 
 Tenet Healthsystem Hospitals, Inc. v. Taitel,
 
 855 So.2d 1257, 1258 (Fla. 4th DCA 2003), the Fourth District considered whether “a blank hospital form used for testing the competency of nurses” was protected by section 766.101(5). Observing that the requested forms were “created by a hospital committee for the purpose of quality assurance and peer review,” the Fourth District held that the forms were protected, even though they were blank.
 
 Id.
 
 at 1258. The Fourth District opined that this result was compelled by the broad standard articulated by the court in
 
 Cruger v. Love,
 
 599 So.2d 111, 113-14 (Fla.1992), which recognizes a statutory protection for all documents created or considered by peer review and credentialing committees.
 

 We do not agree with the
 
 Taitel
 
 court that the
 
 Cruger
 
 standard requires the protection of blank forms. It is the information provided on the forms, not the blank forms themselves, that are considered by credentialing committees. Moreover, on the record before us, it has not been shown that the hospital’s credentialing committee or review board created the form in question. Thus, although the trial court did depart from the essential requirements of the law in failing to follow
 
 Taitel,
 
 which was the only district court decision on point at the time, the departure was harmless. Accordingly, we deny the petition as to the ruling requiring the production of the blank application for medical staff privileges.
 

 Conclusion
 

 For the reasons expressed above, we grant, in part, the petition challenging the February 9, 2009, order, but only as to the ruling requiring the production of evidence of the doctors’ training. In all other respects, both petitions are denied.
 

 No further motions for rehearing will be entertained. The Clerk is directed to issue the mandate forthwith.
 

 GRANTED in part; and DENIED in part.
 

 BARFIELD and PADOVANO, JJ., concur.
 

 [1]
 

 . Petitioner filed an affidavit from its risk manager attesting to the burdensomeness of the requests.
 

 [2]
 

 . This Court has recognized that medical staff bylaws constitute a contract between a hospital and its staff.
 
 See Lawnwood Med. Ctr., Inc.
 
 v.
 
 Seeger,
 
 959 So.2d 1222, 1224-25 (Fla. 1st DCA 2007).